Filed 7/30/25  Marriage of Miele CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of KIMBERLY and STEPHEN WAYNE MIELE. | |
| KIMBERLY MIELE, Respondent, v. STEPHEN WAYNE MIELE, Appellant. | A170393 (Contra Costa County Super. Ct. No. D23-04614) |

Stephen Wayne Miele appeals from an order granting a request by Kimberly Miele[1] for a three-year Domestic Violence Restraining Order (DVRO) under the Domestic Violence Prevention Act (DVPA).  (Fam. Code,[2] § 6200 et seq.)  Stephen generally challenges the sufficiency of the evidence presented but also alleges bias by the trial court and error in the court's alleged failure to consider the best interests of their child and Kimberly's "repeated violations of the custody order," which "constituted contempt of court."  We see no error and affirm.

_____

[1] We refer to the parties by their first names for clarity; we intend no disrespect.

[2] Further undesignated statutory references are to the Family Code.

1

Stephen and Kimberly are married but legally separated in 2011 and share legal custody of their son, who was born in 2008. In 2011, Kimberly filed a petition for dissolution in the Sacramento County Superior Court (case No. 11FL07092) with an accompanying request for a DVRO (case No. 11DV02312). In May 2012, the DVRO was granted, protecting Kimberly and their child for a period of three years; Kimberly was also granted sole physical custody of the child. In April 2015, the DVRO was extended for five years; it expired on July 24, 2020. The restraining orders and ongoing dissolution proceedings provided for visits between Stephen and the child.[3]

On December 15, 2023, Kimberly filed in the Contra Costa County Superior Court a request for a new temporary restraining order (TRO) protecting herself but *not* their child, based on a December 9, 2023 "incident" at Kimberly's house. Kimberly's attached declaration explains that, on December 9, Stephen drove to her house, called the police, and showed them "an invalid custody and visitation order that has since been overridden" in an effort to visit with their child. The police purportedly told Kimberly that Stephen was "demanding that my son . . . (15) go with him," but they were concerned about Stephen's "erratic and demanding behavior." Kimberly stated that she and her son told the police they were scared of Stephen and did not want to speak with him. The police left, and, "all of a sudden, Steve was banging and kicking the door while screaming at the top of his lungs, 'He

---

[3] Though referenced by the parties in the 2023 DVRO request and opposition and at the related 2024 DVRO hearing, the specific custodial orders are not part of the appellate record, nor are they the subject of this appeal.

will fucking come with me!' "[4]  According to the declaration, the "police sent [Stephen] away and then told [Kimberly and her son] to be careful and not [to] open the door to anyone."

The declaration also describes an incident on December 2, 2023, when Stephen "showed up" at their son's wrestling tournament seeking visitation. Kimberly "did not want to talk . . . in a public setting, especially when [Stephen was] so obviously angry." Stephen called the police. When the police arrived, Kimberly told them that "Steve had, again, an incorrect custody agreement," and their son was not going to return home with Stephen. The police left, but Stephen called them again later that afternoon. Kimberly represented that the police sent Stephen home and "told [him] they could not do anything."

In her declaration, Kimberly further explained that Stephen and their son had been talking on the phone "about once a week" and texting "daily" until about three weeks before the December 9 incident, "when Steve's behavior was becoming more and more threatening." Kimberly represented that Stephen screams at their son and demands daily telephone calls; their son has "become more and more frightened of his father . . . ." Stephen has also "screamed at" and "threatened" Kimberly; Steve "has been physically abusive and he is always threatening verbally." Kimberly concluded, "I really need this injunction because I fear for mine and my son[']s safety. Steve is escalating. . . . He is harassing me with phone calls and texts. He is abusing the staff at my son's school. He is demanding that they make my son talk to him. I'm afraid that he is following through with his threats. . . . Steve has threatened to kill me in the past . . . ." Kimberly also included photocopies of

---

[4] The TRO request also attached the police incident report from December 9, 2023.

text messages from Stephen to her and their child demonstrating Stephen's behavior.

The trial court issued a TRO protecting Kimberly from Stephen and set a DVRO hearing date that was ultimately continued until March 2024.[5]

On February 16, 2024, Stephen filed a response to Kimberly's DVRO request. In his attached declaration, Stephen complained that Kimberly obtained the prior restraining orders using "false information." He stated, "the facts also support that I am the victim" because Kimberly "is alienating my son" and has "violat[ed] the custody orders." Stephen represented that he had not seen their son since July 2023, so went to Kimberly's house on December 9, "and tried to pick up my son according to the custody order." Stephen acknowledged he "may have overreacted," but denied "showing any threatening behavior."

As for the incident on December 2, Stephen explained, "I wanted to see my son according to my custody order and take him with me, but my wife did not let my son come with me." He "had the correct custody order," but "the police were not helpful."

Stephen included photocopies of text messages between him and Kimberly in order to show she "completely disregards the court custody order," and "controls my son in such a way that I do not even get invited to my son's wrestling game." Stephen complained that instead of cooperating to coordinate custody and visitation, Kimberly "manipulates and alienates the child" and "is constantly making up excuses not to send my son to me." Stephen also included photocopies of text messages between himself and

_____

[5] Consistent with Kimberly's December 2023 restraining order request, the TRO did not list their son as a protected person but did instruct the parties to follow the current Sacramento County Superior Court child custody orders and permitted contact as needed for that purpose.

4

their son as evidence of this "alienation," noted that Kimberly did not request a change in custody or visitation as part of her DVRO request, and asserted that granting the DVRO "will create undue burden for me to get [a]hold of my son and that is not in the best interest of the child."

At the DVRO hearing on March 13, 2024, both Kimberly and Stephen testified to the truth of their submissions and declarations. Kimberly further testified that in both December incidents, Stephen appeared, claiming that he had the right to take their son based on "old custody orders that he just pulled out to fit the day." She explained that the police filed a report on December 9 because Stephen "became real volatile" and started "banging in the door, kicking it and yelling," as he was trying to beat the door down. Kimberly was concerned by Stephen's actions, including his yelling at the police, "I don't have a restraining order, I can do whatever I want. Then he continued to bang and kick on the door while he yelled, I'm going to take my son right away. You're fucking coming with me now. Kim, you better fucking give me my son or I'm going to kill you. If you don't come out and give you [*sic*] my son I'm coming in." Kimberly also represented that Stephen continued to text her after he had been served with the TRO.[6]

When Stephen testified, he denied violating the TRO or threatening to kill Kimberly but admitted, "I did go up the stairs. I did knock on the door rather aggressively. I did tell the police officers that, no, I do not have a restraining order and that I had the right to have my custody and visitation met. I brought the latest copy of my visitation order and I showed the police. And I asked them to enforce it." Stephen represented the officers never told

---

[6] At the court's request, Kimberly showed the text messages to the court, which then gave copies to Stephen.

him that they were not going to permit him to take their son, but they "kept saying things to me to sort of escalate the matter."

Stephen explained that "things began to fall apart" around June 2023, when his son stopped calling or returning text messages, so Stephen "tried to step up my efforts on my end to try to, you know, stay in contact with my boy." Stephen would ask Kimberly, "please have Sonny Boy call me up. Please have him return my texts," but she wouldn't respond. Stephen said, "if I have to pay child support, I should be entitled to my visitation . . . . I've done nothing but be patient and polite." He acknowledged, "I'm disappointed and I'm frustrated and I'm aggravated and I'm angry and I have a lot of emotion around this," but denied being aggressive or abusive and said, "I pose zero threat to her. . . . [¶] . . . [¶] I'm a peaceful, loving man." Stephen cautioned the court, "a restraining order has been a very effective tool for her in the past, and if she were to get another -- lord knows when I'd see my son again. . . . [¶] . . . [¶] [S]he'll do anything she can to keep me from exercising my parental rights"

The court found Kimberly "credible in all particulars"[7] and issued a three-year DVRO protecting Kimberly from Stephen "with exceptions as it relates to communication regarding custody and visitation." The court made no orders concerning their child and instructed the parties to follow the custody orders issued by the Sacramento County Superior Court, where any related modification requests needed to be made.

---

[7] The transcript refers to "Mr." rather than "Ms." Miele, but we consider that a typographical error in view of the substance of the court's findings and related order: "So as it relates to what the request is, [Ms.] Miele, especially as it relates to what happened at your home, I find you credible in all particulars. It means I believe you in what happened at your home. In fact, Mr. Miele, to some extent, has engaged in familiar behavior with what you have described having occurred."

Stephen timely appealed.

## DISCUSSION

Stephen appeals on four grounds:  (1) there was insufficient evidence to support the issuance of the DVRO; (2) the trial court "demonstrated bias by disregarding exculpatory evidence, admitting improperly served evidence, and ignoring [Kimberly's] repeated violations of custody orders"; (3) the trial court failed to consider the best interests of the child in issuing the DVRO; and (4) the trial court failed to address Kimberly's "repeated violations of the custody order," which "constituted contempt of court."  For varied reasons discussed below, all of these arguments have been forfeited, and, even if not forfeited, none have merit.

## I. *Insufficient Evidence*

Stephen's insufficient evidence argument begins with his "statement of facts" and ends with the assertion that there was "No prior allegation of threats in [Kimberly's] initial restraining order declaration"; "No police report corroborated [Kimberly's] claim that [Stephen] threatened to kill her"; and "No immediate law enforcement action was taken" on December 9, "which would have been expected had such a threat been made."

But a statement of facts must state critical facts and evidence accurately and fairly, and issues and arguments can be waived by material omission.  (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531.) Stephen's opening brief focuses almost entirely on evidence supporting his view of the case:  his behavior was non-threatening, and Kimberly has violated court orders, denied his attempts to visit their son, and is "fostering hostility between" him and their son.  Stephen's briefing does not, however, discuss the threatening behavior he exhibited on December 9, banging on and kicking the front door, while yelling and demanding access to his son.  Even

Stephen acknowledged to the trial court that he "may have overreacted" and "did knock on the door rather aggressively."

Stephen similarly minimized the December 2 incident, claiming he attempted to pick up his son "in accordance with the . . . visitation order, but [Kimberly] refused to comply." His briefing omits mention of both Kimberly's and their son's requests for Stephen not to come to the wrestling tournament and does not explain why he requested police assistance twice at the tournament, and that, per Kimberly's declaration, he was "obviously angry." With his one-sided recitation of "facts" and these material omissions, Stephen has forfeited any challenge to the sufficiency of the evidence supporting the trial court's DVRO ruling. (See *Ashby v. Ashby* (2021) 68 Cal.App.5th 491, 509 [by "reciting only favorable evidence, [appellant] forfeited his sufficiency of the evidence" challenge to trial court's DVRO ruling].)

Moreover, Stephen's briefing fails to cite legal authority in support of his claim of insufficient evidence. Because "Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review" (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078), we may treat these contentions as waived. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 (*Falcone*).) Stephen's status as a self-represented litigant does not relieve him of these obligations. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247 ["as is the case with attorneys, pro. per. litigants must follow correct rules of procedure"].)

Putting aside these fatal flaws in Stephen's briefing, substantial evidence supports the trial court's ruling. First, a lower court's rulings are presumed correct, and the appellant bears the burden of affirmatively

showing error. (*Universal Home Improvement, Inc. v. Robertson* (2020) 51 Cal.App.5th 116, 125.) Stephen's factually and legally unsupported claims do not satisfy this burden.

Second, substantial evidence supports the trial court's finding that Stephen's conduct on December 9 violated the DVPA. "Under the DVPA, the trial court may issue an order 'to restrain any person for the purpose of preventing a recurrence of domestic violence and ensuring a period of separation of the persons involved' upon 'reasonable proof of a past act or acts of abuse.' " (*Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 782, quoting § 6300.) "[A]buse is not limited to the actual infliction of physical injury or assault" (§ 6203, subd. (b)) but instead includes threatening or harassing conduct or conduct that "disturb[s] the peace of the other party." (§ 6320, subd. (a).) " '[D]isturbing the peace of the other party' refers to conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party . . . by any method or through any means." (§ 6320, subd. (c).) A court may issue a DVRO "based solely on the affidavit or testimony of the person requesting the restraining order." (§ 6300, subd. (a).) "We review the trial court's grant or denial of a DVPA restraining order request for an abuse of discretion. [Citation.] . . . [Citation.] ' "To the extent that we are called upon to review the trial court's factual findings, we apply a substantial evidence standard of review." ' " (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 115–116.)

Kimberly's declaration and testimony provide abundant evidence that Stephen's conduct on December 9 was consistent with his behavior on December 2 and before and was threatening and harassing and disturbed her peace under the DVPA. Stephen appeared at Kimberly's home on December 9, and, when he was unable to take his son with him, screamed, yelled, and

9

banged and kicked the door. Kimberly testified that Stephen threatened to kill her if she did not give him their son and that she and their son were frightened of Stephen. Kimberly's DVRO request alleged "years" of prior physical and verbal abuse and threatening behavior, including previous threats to kill her.

We also reject Stephen's assertion that Kimberly's testimony was "uncorroborated, inconsistent, and contradictory" and thus the trial court should not have found her credible. In support of this argument, Stephen contends that because the December 9 police report did not specify that Stephen threatened to kill Kimberly on that date, Kimberly fabricated her testimony at the DVRO hearing.[8] But Stephen's myopic argument overlooks Kimberly's repeated reference to a history of domestic violence and increasingly threatening behavior, including threats to kill. For example, in her December 2023 TRO application, Kimberly explains she secured the initial 2011 DVRO because Stephen had engaged in "physical, mental and emotional violence." Kimberly further alleged she told the police on December 9, "some of the history of domestic violence" and that she and their

---

[8] We do not discuss the admissibility of the police report attached to the 2023 DVRO application because it does not appear to have been discussed or considered at hearing, nor is its admissibility raised as an issue on appeal. However, in examining Stephen's appellate argument that the police report presents evidence of Kimberly's inconsistent testimony that the trial court erroneously overlooked, we do note that while Kimberly's TRO application and the attached police report do not include specific mention of threats to kill on December 9, the TRO application does state that Stephen threatened to kill her in the past, and the police report also says there were "prior threats and domestic violence." Notably inconsistent with Stephen's one-sided narration of the case, the police further characterized Stephen's behavior on December 9 as "angry," "enraged," and "erratic"; Stephen was "breathing heavy, pacing and extremely agitated" and, at one point, "appeared to be posturing toward" the police sergeant.

son "were scared." She stated, "Steve's behavior was becoming more and more threatening"; "Steve [has] screamed at me and threatened me"; he "has been physically abusive and he is always threatening verbally." Kimberly said she fears "for my and my son[']s safety" because she is "afraid that he is following through with his threats"; Stephen "has threatened to kill me in the past . . . ."

In addition, it is well settled that the "trial court [is] in the best position to evaluate credibility and to resolve factual disputes." (*In re Marriage of Evilsizor & Sweeney* (2015) 237 Cal.App.4th 1416, 1426; see *McCord v. Smith* (2020) 51 Cal.App.5th 358, 364 ["Credibility determinations are the province of the trial court"].) Here, that evaluation was made simpler by Stephen's declaration and testimony that corroborated many of Kimberly's claims and included Stephen's acknowledgement he "may have overreacted" and "did knock on the door rather aggressively." Moreover, Stephen's animated and obstreperous behavior at the hearing led the court in issuing the DVRO to specifically note, "In fact, Mr. Miele, to some extent, has engaged in familiar behavior with what you have described having occurred." After the court indicated her ruling, Stephen continued to "interrupt," "talk over," and "raise [his] voice" at the court, leading the court to affirm its initial determination, "Mr. Miele, you are continuing to engage in the kind of behaviors that demonstrate why the court is putting in place the three-year order that it has already ruled is going into place." There was no error.[9]

---

[9] Stephen also asserts that the court improperly admitted into evidence text messages that Kimberly gave to the court on the date of hearing without providing them to Stephen at least five days in advance "as required by law." Again, because Stephen does not specify what "law" he is relying on, his argument is forfeited. (*Falcone*, *supra*, 164 Cal.App.4th at p. 830.)

Regardless, the court provided Stephen with an opportunity to review the text messages at the hearing, after which, Stephen neither objected to

## II.  *Trial Court Bias*

Stephen contends that the court violated his right to a fair hearing because it was biased against him, as demonstrated by the court's ignorance of the police report that contradicted Kimberly's claims and Kimberly's failure to comply with the existing custody and visitation orders, as well as the court's reliance on inadmissible and unverified allegations "such as claims of road rage and fights in restaurants."[10]  Stephen fails to explain how his contentions are supported by legal authority or indicate bias, and thus, we treat these contentions as forfeited. (*Falcone*, *supra*, 164 Cal.App.4th at p. 830.)

Even if not forfeited, Stephen's claims have no merit.  First, it is unclear if the court considered the allegations that Stephen now challenges, particularly since no objection was made at the hearing and there is no specific mention of these incidents on the record.  Second, the record shows the court considered Kimberly's testimony critically.  For example, the court corrected as inaccurate Kimberly's suggestion that Stephen had spent the "entire day with his son" on December 2, stating their son was likely focused

---

their consideration nor requested a continuance or other remedy, thus, he has forfeited any claim of error. (*In re Marriage of Moore* (2024) 102 Cal.App.5th 1275, 1289 ["The failure to raise an issue in the trial court forfeits the claim of error on appeal"].)  Moreover, the court did not articulate the text messages as a basis for the ruling—which largely appear to concern visitation and was therefore permitted—thus any potential error is harmless.

[10] In relevant part, Kimberly's declaration represents, "Steve lives with his 31 year old daughter and they have a very tumultuous relationship.  They will scream and yell at each other in the car and scare my son.  Steve has been involved with road rage incidents while my son was in the car and my son called me to pick him up. . . .  [¶] [Our son] recently showed me video, on Youtube, where Steve and [our son] were on the news because Steve started a fight in restaurant.  [Our son] was in the middle of 3 men and Steve, trying to protect his dad."

on his wrestling tournament, "[w]hich is not the same as spending the whole day with your parent." Third, a court may issue a DVRO based solely on the affidavit or testimony of the person requesting the order after notice and a hearing. (See *McCord v. Smith*, *supra*, 51 Cal.App.5th at p. 364; §§ 6300, 6340, subd. (a).) Fourth, the court's finding that Kimberly was credible does not, in itself, demonstrate bias. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111–1112 ["Mere expressions of opinion by a trial judge based on actual observation of the witnesses and evidence in the courtroom do not demonstrate a bias"], overruled on another ground by *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

Moreover, the court's conduct during the DVRO hearing shows the absence of any bias against Stephen. To start, when Kimberly represented Stephen had improperly messaged her after the issuance of the TRO, the court took immediate steps to provide those messages to Stephen to give him the opportunity to respond. In addition, the court repeatedly stated that it had "no jurisdiction and is making no orders as it relates to your minor child. [¶] . . . [¶] Or to the custody and visitation as . . . those orders are completely out of Sacramento County." The court clarified that a DVRO "does not stand in the way or prevent you from having contact with your son" and reiterated that any custody and visitation disputes would need to be addressed in the Sacramento County Superior Court, not at the DVRO hearing.

Stephen's own comments at hearing present further evidence of the absence of court bias. Stephen thanked the court for giving him the opportunity to speak out as he had not previously: "this is the only time in my son's entire -- in all of these years that I've had an opportunity to speak on my own behalf." Before the court's ruling, he added, "I appreciate that

13

you've been very gracious with me." That Stephen's perspective changed after the court ruled against him does not show bias or error.

### III. *The Best Interests of the Child*

Stephen next argues that the court failed to consider the best interests of their child when issuing the DVRO, but again he fails to cite to any legal authority requiring a trial court to consider a "parent's ability to maintain a meaningful relationship with the child" when issuing a restraining order, particularly where the requested order does not include the child as a protected party.[11] Stephen's citation to section 3011, which requires the court's consideration of the best interests of the child when issuing orders for child custody and visitation, is inapplicable because custody was not at issue in the 2024 DVRO proceeding, and the DVRO specifically permitted communication for the purpose of visitation.[12] Accordingly, Stephen has forfeited this contention. (*Falcone, supra*, 164 Cal.App.4th at p. 830.)

Nevertheless, the court appears to have considered the interests of the child in making its orders. For example, in considering the December 2 incident, the court noted their son was likely "significantly more focused on his own event than having to deal with his parents or was also really not there to spend time with either parent," and that the "child [was] hopefully getting to escape whatever difficulty they have navigated as a young high school student." The court also repeatedly reminded the parties that the

---

[11] Indeed, the court reminded the parties that the order contained an exception to the no-contact order for the specific reason of facilitating child visitation.

[12] See also section 3021, which lists the proceedings in which the court may make child custody orders, including but not limited to proceedings concerning the dissolution of marriage and "a proceeding to determine physical or legal custody or for visitation in a proceeding pursuant to the [DVPA]." (§ 3021.)

14

DVRO did not impact the existing custody and visitation orders and, as stated, included an exception to the no-contact order "as it relates to communication regarding custody and visitation." Thus, Stephen's argument fails.

## IV. *Contempt of Court*

Last, Stephen claims that Kimberly is guilty of contempt of court for failing to comply with their existing custody and visitation orders, and the trial court erred in "failing to consider [Kimberly's] contemptuous actions."[13] This argument again fails because Stephen does not offer any legal authority supporting his current assertion of contempt or explain its relevance to the trial court's DVRO determination. (*Falcone, supra*, 164 Cal.App.4th at p. 830.) More importantly, Stephen did not raise the issue of contempt before the trial court. While he complained Kimberly did not comply with existing visitation orders, Stephen did not include the orders in his opposition to the DVRO request, nor did he file or orally make a motion for contempt before the trial court. It is understandable to have not raised the issue of contempt before a court that did not have jurisdiction over the Mieles' dissolution and related custody orders, but for the same reason, failure to specifically raise the issue of contempt of court at the DVRO hearing is fatal to Stephen's claim on appeal. (*In re Marriage of Moore, supra*, 102 Cal.App.5th at p. 1289 ["The failure to raise an issue in the trial court forfeits the claim of error on appeal"].)

---

[13] To the extent Stephen contends the DVRO court should have enforced the prior custody orders, he relies on material not before that court or part of the appellate record, which also appears to be within the jurisdiction of the Sacramento County Superior Court. We therefore disregard those arguments. (See *Cypress Security, LLC v. City and County of San Francisco* (2010) 184 Cal.App.4th 1003, 1014.)

15

## DISPOSITION

The domestic violence restraining order is affirmed.

DESAUTELS, J.

We concur:


STEWART, P. J.


RICHMAN, J.


*In re Marriage of Miele* (A170393)